IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

F I L E D

MAY **1 9** 2005

U.S. DISTRICT COURT
CLARKSBURG, WV 26301

SHERMAN ROBINSON,

      Plaintiff,

v.

      Civil Action No. **1:04CV92**
      (Judge Irene M. Keeley)

JO ANNE B. BARNHART,
Commissioner of Social Security,

      Defendant.

## OPINION/REPORT AND RECOMMENDATION

This is an action for judicial review of the final decision of the defendant Commissioner of

the Social Security Administration ("the Commissioner") denying Plaintiff's claim for disability

insurance benefits ("DIB") under Title II of the Social Security Act. The matter is awaiting decision

on cross motions for summary judgment and has been referred to the undersigned United States

Magistrate Judge for submission of proposed findings of fact and recommended disposition. 28

U.S.C. § 636(b)(1)(B); Fed. R. Civ. P. 72(b).

### I. PROCEDURAL HISTORY

Sherman Robinson ("Plaintiff) filed an application for DIB on January 5, 2002, alleging

disability since September 10, 2001, due to lumbar disc disease, glaucoma, and depression (R. 16,

118-20, 133-42). Plaintiff's application was denied initially and upon reconsideration (R. 98-99).

Plaintiff requested a hearing, which Administrative Law Judge Barbara Gibbs ("ALJ") held on April

2, 2003. Plaintiff, who was represented by Regina Carpenter, Esquire, and Dr. Larry Ostrowski, a

Vocational Expert ("VE") testified (R. 40-97). On May 20, 2003, the ALJ entered a decision

finding Plaintiff had lumbar disc disease, glaucoma, and depression, and he would be capable of

performing work at the sedentary exertional level, without exposure to environmental irritants, with only occasional postural changes, in settings that allowed him to sit and stand and which accommodated the use of a cane for ambulation (R. 14-23). The Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner (R. 4-6).

## II. FACTS

Plaintiff was born on February 2, 1955, and was forty-eight (48) years old at the time of the administrative hearing (R. 46). He has a high school education and holds various licenses for trucking and heavy equipment operating (R. 90). From 1978 to 1998, Plaintiff had past relevant work as a coal hauler, who operated a dump truck, a job classified by the VE as medium and unskilled (88-90). From 1998 to September, 2001, Plaintiff operated heavy equipment, drove a truck, and was a heavy equipment mechanic, which the VE classified as medium and semi-skilled (R. 89-90).

Plaintiff sustained an injury to his back on September 1, 2001, as he "picked up a ramp on the back of a trailer." Plaintiff continued to work until September 10, 2001 (R. 47).

On September 24, 2001, Plaintiff reported to the Manchin Clinic, located in Farmington, West Virginia. He stated he had injured his back on September 10, 2001, at work. He "felt something pop" in his low back, and he experienced rather intense pain, which traveled down his left leg. The physician's assistant who examined Plaintiff noted a positive straight leg raising test. She diagnosed low back pain and lower extremity radicular pain. She prescribed Darvocet for pain and muscle relaxers. She instructed Plaintiff to begin physical therapy and ordered a CT scan of Plaintiff's lumbar spine (R. 200).

A CT scan was performed of Plaintiff's lumbar spine on September 24, 2001. William

2

Hirsch, M.D., found no abnormality at L3-4 and L4-5. He noted a slightly diffused bulging of the L5-S1 disc, which was more prominent on the left, touching the left S1 nerve root sleeve. His impression was of "[c]entral and left-sided protrusion/herniation of L5-S1; equivocal for minimal posterior displacement of left S1 root in the lateral recess" (R. 201).

On September 25, 2001, Plaintiff returned to the Manchin Clinic, where John Manchin, II, D.O., observed Plaintiff had decreased range of motion with "side bending, rotation, flexion and extension." Dr. Manchin diagnosed "[l]umbosacral disc disease with possible herniation" and instructed Plaintiff to continue physical therapy (R. 199).

On September 26, 2001, Plaintiff returned to Dr. Manchin with continued lumbosacral pain; he was referred to Julian Bailes, M.D., Chairman of the WVU Department of Neurology, located in Morgantown, West Virginia (R. 198). On October 1, 2001, Plaintiff returned to Dr. Manchin with low back pain and requested his pain medication be refilled. He was provided a prescription for twenty (20) Darvocet (R. 197). On October 23, 2001, Plaintiff was examined by Dr. Manchin, who observed decreased range of motion with "side bending, rotation, flexion and extension" and "pain on palpation perilumbar musculature" (R. 196).

On October 29, 2001, Plaintiff was evaluated by Dr. Bailes and Nicci McFadden, PA-C (R. 174-75). Dr. Bailes noted Plaintiff stated the physical therapy and conservative treatment provided to him at the Manchin Clinic had "not alleviated his pain." Plaintiff described his pain to Dr. Bailes as "left leg pain as well as low back pain with low back pain greater at times than the left leg pain." Plaintiff stated the pain was an "aching sensation," was "severe at times," occurred daily, woke him during the night, and was "exacerbated by sitting and lifting." Dr. Bailes observed, during his neurologic examination of Plaintiff, the following: 1) deep tendon reflexes +2; 2) right ankle and

3

knee jerk; 3) no left knee jerk; 4) +1 left ankle jerk; 5) negative straight-leg raise bilaterally; 6) negative jugular compression test; 7) 5/5 motor examination in all lower extremities, including plantar flexors and "EHLs"; 8) intact lower sensory examination; and 9) some tenderness over the left-side L4-5 region upon palpation. Dr. Bailes reviewed the September 24, 2001, CT scan of Plaintiff and noted, in conjunction with his examination of Plaintiff, that Plaintiff "most likely had findings consistent with an L5-S1 herniated nucleus pulposus on the left." He opined a lumbar sacral MRI would be useful to "delineate the pathology for further neurological disposition . . ." (R. 174).

Plaintiff returned to Manchin Clinic on November 1, 2001, at which time he reported he had been evaluated by Dr. Bailes, who had diagnosed his condition as a herniated disc, was considering performing surgery, and had ordered an MRI (R. 195). On November 12, November 14, and November 16, 2001, Plaintiff visited the Manchin Clinic for lumbosacral pain. Decreased range of motion was noted (R. 192-94).

On November 26, 2001, an MRI was performed of Plaintiff's lumbosacral spine (R. 169-70). It revealed "preservation of vertebral body height and alignment." "Modic type II changes" were "noted along the anterior-superior endplate of T12 vertebral body." An increase at the T1 and T2 signal was noted. The termination of the "conus medullaris" and the "layering of the cauda equina" were normal. There were no "focal disk bulge or herniation" noted. There was "preservation of the intervertebral disk height." Jeffrey S. Carpenter, M.D., who interpreted the MRI, rendered the following impression: "[e]ssentially unremarkable MRI study of the lumbosacral spine" (R. 169).

The only reference in the record of Plaintiff's follow-up visit with Dr. Bailes is contained in a medical report to the West Virginia Bureau of Employment Programs, Workers' Compensation Division, from Jack S. Koay, M.D., of Fairmont, West Virginia, dated February 11, 2003 (R. 300-15). Dr. Koay stated the following:

4

1. Prior to the M.R.I. of the L-S spine was taken, Dr. Bailes wanted to do the surgery on him immediately. However, after the M.R.I. was taken, Dr. Bailes recommended conservative treatment.

2. Dr. Bailes put him on steroids for swelling and Percocet for pain on the lower back of the lumbar area.

3. After the M.R.I. was taken on November 26, 2001, Dr. Bailes decided to treat Mr. Robinson conservatively and no surgery was indicated. He was told by Dr. Bailes that he had a deteriorating disc with a physical therapy treatment, a course of treatment, then probably he could return work.

4. This information was submitted to me by Jack Davis, Vocational Case Manager of Alternative Careers and Transitions (R. 301).

Plaintiff continued his visits to the Manchin Clinic. On November 30, 2001, Dr. Manchin noted Plaintiff's condition as "[w]orkers comp lumbosacral disc disease with herniated disc" and that Plaintiff's range of motion was still decreased, with side bending, rotation, flexion and extension (R. 191). On December 10, 2001, Dr. Manchin noted lumbosacral disc disease, decreased range of motion with side bending, rotation, flexion and extension, and that Plaintiff should continue physical therapy (R. 190). On December 17, 2001, Dr. Manchin diagnosed Plaintiff with lumbosacral disc disease and noted he presented with continued pain and decreased range of motion, with side bending, rotation, flexion, and extension of the LS spine. An examination revealed pain on palpation of perilumbar area. Dr. Manchin limited Plaintiff's physical therapy to electric stimulation (R. 189).

At Plaintiff's December 19, 2001, visit to the Manchin Clinic, Dr. Manchin noted Plaintiff symptoms as low back pain "Workers comp." He noted Plaintiff's range of motion and perilumbar pain had not changed. He ordered a continuation of Plaintiff's electric stimulation physical therapy treatments (R. 188). On December 24, 2001, Dr. Manchin diagnosed "workers comp lumbosacral

5

pain, bilateral lower extremity radiculopathy." He noted Plaintiff's range of motion and perilumbar pain had not changed (R. 187). On December 26, 2001, Dr. Manchin noted Plaintiff's symptoms as "[l]umbosacral pain, workers comp" and that Plaintiff still had pain and decreased range of motion "with side bending, rotation, flexion and extension, lumbar area, especially L perilumbar area." Dr. Manchin diagnosed "[l]umbosacral disc disease and myofascitis, LLE radiculopathy" and instructed Plaintiff to continue with electric stimulation and to begin therapeutic exercises and massage (R. 186). On December 28, 2001, Dr. Manchin noted Plaintiff's symptoms as lumbosacral pain, "Workers comp." He noted Plaintiff's continued decreased range of motion and perilumbar pain. He instructed Plaintiff to continue electric stimulation, therapeutic exercises, and massage (R. 185).

On January 2, 2002, Plaintiff returned to the Manchin Clinic, and Dr. Manchin observed Plaintiff had lumbosacral pain, "LLE radiculopathy," continued decreased range of motion, and continued perilumbar pain. He instructed Plaintiff to continue electric stimulation, therapeutic exercises, and massage (R. 184). On January 4, 2002, Dr. Manchin noted Plaintiff presented with "LS pain for his workers comp." He also noted Plaintiff's continued decreased range of motion (R. 183). On January 7, 2002, Dr. Manchin noted Plaintiff continued to complain with "lumbosacral pain, LLE radiculopathy with numbness." He observed Plaintiff's decreased range of motion "with side bending, rotation, flexion and extension of the lumbosacral spine" and perilumbar pain and decreased reflexes on the left. He instructed Plaintiff to continue electric stimulation, therapeutic exercises, and massage (R. 182).

On January 9, 2002, Plaintiff visited the Manchin Clinic. Dr. Manchin diagnosed lumbosacral disc disease and low back pain. He noted Plaintiff's continued decreased range of

motion and perilumbar pain. He instructed Plaintiff to continue the previously prescribed physical therapy (R. 181). On January 11, January 14, 2002, and January 16, 2002, Dr. Manchin's diagnoses and instructions were identical to those rendered on January 9, 2002 (R. 178-80).

On January 17, 2002, Plaintiff was evaluated by James D. Weinstein, M.D., of Associated Specialists, Inc., located in Nutter Fort, West Virginia. Plaintiff informed Dr. Weinstein that he experienced pain mostly in his left hip, left buttock, and left thigh, and he noticed "his left lower extremity 'gives out' episodically." Dr. Weinstein reviewed Plaintiff's MRI. Dr. Weinstein stated the examination of Plaintiff was "not overly positive." His examination produced pain for Plaintiff when the doctor "put some stress on his sacroiliac joint bilaterally." He opined, based on that examination and review of Plaintiff's MRI, that Plaintiff could have "sacroiliac strain and sprain and/or lumbar strain and sprain." Dr. Weinstein recommended a "program of back exercises and walking" for Plaintiff and suggested "he should have a trial of a steroid marcaine injection into the left sacroiliac joint." Dr. Weinstein noted that although Plaintiff's "problems are troubling him, . . . there is nothing surgical that I would recommend" (R. 204).

On January 23, 2002, Plaintiff returned to the Manchin Clinic. Dr. Manchin's diagnoses and therapy instructions remained unchanged (R. 177). On January 25, 2002, Dr. Manchin noted Plaintiff's symptoms to be lumbosacral pain and feelings of depression because he did not "feel like doing anything or going out of the house." He prescribed Effexor; his diagnoses and therapy instructions remained unchanged (R. 176).

On February 15, 2002, Plaintiff visited the Manchin Clinic. Dr. Manchin noted Plaintiff's symptoms were of "LS pain," and his range of motion was still decreased. He also noted that even though Plaintiff continued with physical therapy, he was "not improving" (R. 265). On February 18,

2002, Dr. Manchin noted Plaintiff's symptoms included "[w]orkers comp low back pain, especially L perilumbar, goes down his LLE." Dr. Manchin observed decreased range of motion "with side bending, rotation, flexion and extension" and decreased "reflexes in the LLE compared to the R" (R. 263). On March 14, 2002, Plaintiff complained of "Workers comp low back pain." Dr. Manchin noted Plaintiff was "seeing Dr. Weinstein and he has also seen Dr. Bailes" and that "Dr. Weinstein recommended he have some steroid injections." Dr. Manchin also noted he would attempt to get Workers' Compensation approval for those injections and that Plaintiff wanted a moist heating pad (R. 259).

On March 25, 2002, Plaintiff presented at Manchin Clinic for continued evaluation and treatment of his low back pain. Dr. Manchin noted Plaintiff's continued lumbosacral pain and decreased range of motion (R. 256). On April 15, 2002, Dr. Manchin noted Plaintiff's symptoms as continued low back pain with LLE radiculopathy and numbness. Dr. Manchin's examination revealed decreased range of motion and perilumbar pain (R. 255).

On April 30, 2002, Plaintiff received an injection of 40mm Kenalog and 3cc of Sensorcaine .5% at the left side sacroiliac joint. After the injection, Plaintiff experienced "moderate relief of his pain" (R. 203).

On May 10, 2002, Plaintiff returned to the Manchin Clinic, at which time he complained of lumbosacral pain. Dr. Manchin observed decreased range of motion "with side bending, rotation, flexion and extension." Plaintiff stated he was "having injections at the Pain Clinic." He stated he desired to walk "a little bit" and requested a lumbosacral brace because "that helps" (R. 251).

On May 14, 2002, Plaintiff was examined by Keith Wade, O.D., an optometrist, located in Fairmont, West Virginia. Dr. Wade noted Plaintiff's history included having been diagnosed with

8

glaucoma two years earlier and having undergone laser surgery one year ago. An examination of Plaintiff's eyes revealed the following vision without correction: right eye/distant 20/40; left eye/distant 20/40; right eye/near 20/120; and left eye/near 20/120. Plaintiff's eye examination revealed the following vision with correction: right eye/distant 20/40; left eye/distant 20/40; right eye/near 20/200; and left eye/near 20/200. The funduscopic description was "optic nerve heads/cupping very minimal and does not support visual fields finding." Plaintiff's extraocular muscle function, including eyelids, was normal; slit lamp findings were unremarkable; and tonometry was right "16" and left "15." Dr. Wade's diagnosis was "glaucoma with organ laser trabeculoplasty as per history" and "constructed visual fields; optic nerves appear normal and do not support visual fields" (R. 205).

On May 31, 2002, Plaintiff returned to Dr. Feghali, whom he had seen in 2001 (R. R. 211-16, 217-22, 223-26, 227-34). Plaintiff stated his vision had worsened during the past six (6) months and he had experienced "severe headaches" during the past three (3) months. His vision was noted as 20/40 and 20/50. No ocular adenexas were noted. The eye examination was normal and Plaintiff's "[d]ecreased vision possibly due to refractive error," according to Dr. Feghali's notations (R. 209-10)

On June 8, 2002, Dr. Thomas Lauderman, a state agency physician, completed a residual functional capacity assessment (RFC) of Plaintiff for the medical criteria as to glaucoma and back and leg syndrome (R. 235-42). He found Plaintiff could occasionally lift and/or carry fifty (50) pounds, frequently lift and/or carry twenty-five (25) pounds, stand and/or walk about six (6) hours in an eight (8) hour workday, sit with normal breaks for a total of about six (6) hours in an eight (8) hour workday, and no push and/or pull limitations (R. 236). Dr. Lauderman found Plaintiff could

frequently climb ramps and stairs, but never climb ladders, ropes or scaffolds and could frequently balance, stoop, kneel, crouch, and crawl (R. 237). Plaintiff was found to have no manipulative limitations. Dr. Lauderman found Plaintiff's visual limitations to be for unlimited in near acuity, accommodation, color vision, and field vision, but limited in far acuity and depth perception (R. 238). Plaintiff was found to have no communicative limitations and was found to have no environmental limitations, except for having to avoid all exposure to hazards due to his vision (R. 239). Dr. Lauderman reduced Plaintiff's RFC due to pain and fatigue and Plaintiff's visual fields; he found no Listed medical impairment was met or equaled (R. 98, 240).

On June 28, 2002, Dr. Manchin noted Plaintiff's continued complaints of low back pain and decreased range of motion (R. 248).

The record of evidence contains records from the Manchin Clinic as to Plaintiff's receiving physical therapy at the Manchin Clinic from January 29, 2002, through June 28, 2002 (R. 247, 249-50, 252-54, 260-62, 264, 266-68). The record of evidence also contains records from the Manchin Clinic as to Plaintiff's receiving physical therapy at the Manchin Clinic from July 2, 2002, through November 20, 2002 (R. 292-99).

Sometime in June or July, 2002, Plaintiff visited Dr. Serafini at the Pain Clinic, located in Clarksburg, West Virginia. The only reference in the record of evidence to Plaintiff being treated by Dr. Serafini is contained in a medical report from Dr. Koay, dated February 11, 2003 (R. 300-15). Dr. Koay stated the following:

> Mr. Robinson was seen, treated and evaluated by Dr. Serafini at the pain Clinic, Clarksburg, WV, in June or July 2002. Initial plan was a series of three steroid injections. However, after the first injection, because it only helped for a couple of days and hurt Mr. Robinson a lot, so no further injections was carried out. He went to see Dr. Serafini only on one occasion (R. 302).

10

On July 11, 2002, Plaintiff underwent a functional capacity evaluation at HealthWorks Rehab and Fitness, which was authenticated by Parker Grimes, MS, OTR, Director, Industrial Programs (R. 280-91). Plaimtiff was found to be capable of performing work "within the sedentary-light PDC [physical demand classification] level" (R. 280). Plaintiff demonstrated the following functional limitations: 1) decreased general flexibility; 2) decreased endurance; 3) apprehension with lifting activities; 4) low back pain that reportedly inhibits activity; and 5) fear of accumulation factor. Mr. Grimes noted Plaintiff "put forth submaximal effort during portions of the evaluation" and that Plaintiff could, "at times, do more than the individual perceives or states." Mr. Grimes noted Plaintiff could benefit from "pain coping strategies combined with physical restoration to help achieve his maximum physical capabilities" (R. 281). It was determined that Plaintiff could lift fifteen (15) pounds with modified leg lift/floor to knuckle lift; twenty-five (25) pounds with knee lift/twelve inches to knuckle lift; and twenty-five (25) pounds with knuckle to shoulder lift. Plaintiff could carry twenty-five (25) pounds thirty (30) feet. Plaintiff was found to be capable of pushing forty (40) pounds with initial force for ten (10) feet and pulling thirty-eight (38) pounds with initial force for five (5) feet. It was also found that Plaintiff could occasionally walk 1/20 of a mile before having to stop (R. 282). The following additional limitations were found: Plaintiff could 1) not climb ladders due to pain; 2) occasionally climb stairs; 3) occasionally stand; 4) not squat; 5) occasionally stoop and forward bend; 6) frequently reach forward; and 7) frequently handle (R. 283). It was noted in Dr. Koay's February 11, 2003, report to Workers' Compensation, that Plaintiff did not participate in the functional restoration program as recommended (R. 302).

On August 14, 2002, a state agency physician completed a RFC of Plaintiff (R. 269-76). He found Plaintiff could occasionally lift and/or carry twenty (20) pounds, frequently lift and/or carry

ten (10) pounds, stand and/or walk for a total of about six (6) hours in an eight (8) hour workday, sit for a total of about six (6) hours in an eight (8) hour workday, and push/pull unlimited (R. 270). Plaintiff was found to have no communicative limitation. The state agency physician found Plaintiff should avoid concentrated exposure to extreme cold and heat and hazards, but found no limitations as to Plaintiff's exposure to wetness, humidity, noise, vibration, or fumes (R. 271). The state agency physician opined that Plaintiff should occasionally avoid climbing, balancing, stooping, kneeling, crouching, and crawling (R. 273). No manipulative or visual limitations were noted (R. 274).

On February 11, 2003, Dr. Koay performed an independent medical examination for Workers' Compensation consideration (R. 300-15). Dr. Koay noted Plaintiff's chief complaint as "pain on the lower back at the lumbar area." Dr. Koay also noted the history of present illness; present problem; review of systems; past medical history; social history; family history; test results; and synopsis of pertinent records (R. 300-05). Dr. Koay's physical examination of Plaintiff revealed Plaintiff was "not in an acute distress condition at all" and was "able to walk to my office without using a cane, crutches or back brace at all . . . with a normal gait." Dr. Koay observed Plaintiff to be "alert, active, awake, friendly and cooperative." Dr. Koay found Plaintiff's dorsal spine to be unremarkable, observed Plaintiff could "stand on tip toes and both heals well," and "was able to squat with slight difficulty" (R. 304). Dr. Koay's clinical impression was for "lower back pain in the lumbar area with left radiculopathy cause deferred." He determined it was "premature to make a prognosis at" that time. Dr. Koay's conclusions and recommendations were as follows: 1) "at the time of the examination, the condition of the lower back at the lumbar area has not reached M.M.I."; 2) Plaintiff was "temporary totally disabled"; 3) Plaintiff should see Dr. Weinstein for "further evaluation and treatment"; 4) and "E.M.G. of both lower extremities as well as

12

myelogram/C.T. scan of the L-S spine is indicated"; and 5) a three (3) month follow-up should occur (R. 306).

On February 11, 2003, Dr. Manchin authored a letter wherein he stated the following: 1) Plaintiff had "continuous low back pain with left lower extremity radiculopathy"; 2) Plaintiff had "difficulty . . . bending, twisting, lifting, and occasionally when he is walking he gets weakness and almost loses strength in his left lower extremity"; 3)Plaintiff had "marked decreased range of motion with side bending, rotation, flexion and extension of the lumbosacral spine"; 4) Plaintiff exhibited "some decreased reflexes in the left lower extremity compared to the right"; 5) Plaintiff's symptoms were "credible and consistent with his objective medical findings"; 6) the CT scan, which revealed protrusion herniation of the L5-S1, was consistent with the type of symptoms Plaintiff exhibited; 7) the MRI performed on the Plaintiff, which was normal, was a "mistake"; 8) Plaintiff's need to rest three (3) to four (4) hours per day was "consistent with his medical condition"; 9) Plaintiff's spasms responded well to rest; 10) Plaintiff's condition met "the requirements set forth in the regulations for disability social security"; and 11) Plaintiff was "not capable of performing any type of work on a sustained full-time basis" because Plaintiff was "totally disabled secondary to his lumbosacral injury" (R. 318-19).

On February 13, 2003, Dr. Weinstein corresponded with Dr. Manchin about Plaintiff's condition. He noted Plaintiff experienced no relief from the sacroiliac injection. Dr. Weinstein opined that he found nothing "operative with his condition" and that Plaintiff would benefit from walking and isometric exercises. Dr. Weinstein also noted that Plaintiff was filing for Social Security disability benefits and opined that since Plaintiff was forty-eight (48) years old, it would be difficult for him to secure employment; therefore, Dr. Weinstein had "no problem with him trying to get Social security disability (R. 316).

13

At the administrative hearing held on April 2, 2003, Plaintiff testified he was capable of maintaining his own personal hygiene and grooming (R. 51). He stated he experienced difficulty sleeping at night due to his back pain (R. 52). Plaintiff testified he napped two (2) or three (3) times during the day for about fifteen (15) to twenty (20) minutes at a time (R. 53-54). Plaintiff stated he was capable of preparing meals "once in a while," but that he did not do the dishes, laundry, or dusting. He testified that he shopped twice a month at Wal-Mart in Grafton, West Virginia, for about twenty (20) minutes to one-half hour each time (R. 55-56). Plaintiff testified he watched television for six (6) or seven (7) hours per day, read, and cared for his four dogs (R. 57-58). Plaintiff stated he received visitors up to three (3) or four (4) times per month and that he visited his brother in law and friends twice per month (R. 59).

Plaintiff also testified at the administrative hearing that he traveled to the Shop and Save, located in Fairmont, and the municipal offices for the City of Reedsville to pay his utility bills once per month (R. 60-61). He stated he used the telephone to call his doctors, lawyer, and brother in law and could read the numbers listed in the telephone book with the use of his glasses (R. 61-62). Plaintiff stated he attempted to walk as therapy for his back condition as recommended by Dr. Weinstein, but abandoned the effort after three attempts (R. 63-64).

During examination by his counsel at the administrative hearing, Plaintiff testified that his pain stayed "at a constant level" in his lower back and down his left leg. He stated he experienced numbness and burning "in the bone." The numbness occurred, according to Plaintiff's testimony, "maybe three times a week . . . maybe twice a week" (R. 68). Plaintiff described his "good days" with his back as "tolerable," at which time he traveled to "the store or whatever I have to do." He was capable of sitting in a chair for twenty (20) minutes, standing for fifteen (15) to twenty (20)

14

minutes, and walking for twenty (20) to twenty-five (25) minutes (R. 69-70). Plaintiff testified he still needed to lie down three (3) hours during a "good day" and take two (2) Darvocet pills. Plaintiff described his "bad days" with his back as those days when he experienced "throbbing pain" and had to medicate the pain with four (4) to six (6) Darvocet. During his "bad days," Plaintiff stated he was unable to do anything except lie down for eight (8) to ten (10) hours (R. 70-71). Plaintiff testified he had two (2) or three (3) "bad days" per week (R. 74). Plaintiff testified he treated his back pain with pain medication, a back brace, a heating pad, and a small TENS unit (R. 72).

## III. ADMINISTRATIVE LAW JUDGE DECISION

Utilizing the five-step sequential evaluation process prescribed in the Commissioner's regulations at 20 C.F.R. § 404.1520 (2000), ALJ Gibbs made the following findings:

1. The claimant meets the nondisability requirements for a period of disability and Disability Insurance Benefits set forth in Section 216(i) of the Social Security Act and is insured for benefits through the date of this decision.

2. The claimant has not engaged in substantial gainful activity since the alleged onset of disability.

3. The claimant has an impairment or a combination of impairments considered "severe" based on the requirements in the Regulations (20 CFR § 404.1520(b)).

4. These medically determinable impairments do not meet or medically equal one of the listed impairments in 20 CFR Part 404, Appendix 1, Subpart P, Regulation No. 4.

5. The undersigned does not find the claimant's testimony and allegations to be credible regarding the severity of his impairments, pain, and psychiatric symptoms, and their effect on his functional abilities.

6. The undersigned has carefully considered all of the medical opinions in the record regarding the severity of the claimant's impairments (20 CFR § 404.1527).

7. The claimant has the following residual functional capacity: he is able to frequently lift and carry 10 pounds; stand and walk for two hours of an eight-hour workday; sit for prolonged periods; and perform low stress work that is unskilled involving routine and repetitive processes dealing primarily with things, rather than people, and

the claimant is unable to interact with co-workers, supervisors, and occasionally the general public.

8.      The claimant is unable to perform any of his past relevant work (20 CFR § 404.1565).

9.      The claimant is a "younger individual" (20 CFR § 404.1563).

10.      The claimant has a "high school (or high school equivalent) education" (20 CFR § 404.1564).

11.      The claimant has no transferable skills form any past relevant work (20 CFR § 404.1568).

12.      The claimant has the residual functional capacity to perform a significant range of sedentary work (20 CFR § 416.967).

13.      Although the claimant's limitations do not allow him to perform the full range of sedentary work, using Medical-Vocational Rule 201.21 as a framework for decision-making, there are a significant number of jobs in the national economy that he could perform. Examples of such jobs include work as a surveillance systems monitor, accounting clerk, interviewer, and assembler.

14.      The claimant was not under a "disability," as defined in the Social Security Act, at any time through the date of this decision (20 CFR § 404.1520(f)).

## IV. DISCUSSION

### A. Scope of Review

In reviewing an administrative finding of no disability the scope of review is limited to determining whether "the findings of the Secretary are supported by substantial evidence and whether the correct law was applied." *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). The Fourth Circuit held, "Our scope of review is specific and narrow. We do not conduct a de novo review of the evidence, and the Secretary's finding of non-disability is to be upheld, even if the court disagrees, so long as it is supported by substantial evidence." *Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir.1986). Substantial evidence is "such relevant evidence as a reasonable mind might accept

to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). Elaborating on this definition, the Fourth Circuit has stated that substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'" *Hays*, 907 F.2d at 1456 (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1968)). In reviewing the Commissioner's decision, the reviewing court must also consider whether the ALJ applied the proper standards of law: "A factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

## B. Contentions of the Parties

Plaintiff contends:

1. The ALJ's failure to fully discuss the requirements of Listing 1.04 and to compare those requirements to the evidence of record is an error of law that alone requires a reversal of this decision and a remand for proper analysis.

2. The ALJ failed to properly evaluate the medical opinions of the Plaintiff's treating physician as required under SSR 96-2p.

Defendant contends:

1. Plaintiff's spinal impairment does not meet or equal Listing 1.04.

2. Dr. Manchin's opinion was appropriately weighed.

## C. Listing 1.04

Plaintiff contends the ALJ failed to fully discuss the requirements of Listing 1.04 and to compare those requirements to the evidence of record. The Defendant contends that Plaintiff's spinal impairment does not meet or equal Listing 1.04.

In *Cook v. Heckler*, 783 F.2d 1168, the Fourth Circuit held as follows:

> The ALJ should have identified the relevant listed impairments. He should then have compared each of the listed criteria to the evidence of Cook's symptoms. Without such an explanation, it is simply impossible to tell whether there was substantial evidence to support the determination.

The listed criteria for 1.04 is as follows:

> Disorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord . With:
>
> A.    Evidence of nerve root compression characterized by neuroanatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting or supine):
>
> . . .

The ALJ's decision is void of any comparison of the above listed criteria and the symptoms of Plaintiff. Even though the ALJ discussed Plaintiff's complaints of pain, the opinions of Drs. Manchin, Bailes, Weinstein, and Koay, the findings of the state agency physicians, and the results of the CT scan and the MRI, the ALJ did not identify the relevant listing and compare the criteria of that listing to the medical evidence of record as is required in *Cook, supra* (R. 18-20). The ALJ's decision contained the following:

> As will be discussed more fully below, the claimant's impairments, considered singly or in combination, are not of a level of severity to meet or equal any of the impairments detained in Appendix 1 to Subpart P of the Regulations No. 4. In reaching this conclusion, I have evaluated the claimant's musculoskeletal impairments within the provisions of section 1.04 of Appendix 1. There is no evidence to indicate that the claimant's alleged disorders of the spine rise to the level of severity required by this section (R. 16).

This evaluation of evidence, which lacks a comparison of the Listing's criteria and Plaintiff's

symptoms, does not satisfy the requirements as mandated in *Cook, supra.*

Additionally, as the Plaintiff points out in his brief (at p. 7), the Fourth Circuit, in *Ketcher v. Apfel*, 68 F. Supp. 2d, 629, opined the following:

> Under *Cook*, the duty of identification of relevant listed impairments and comparison of symptoms to Listing criteria is only triggered if there is ample evidence in the record to support a determination that the claimant's impairment meets or equals one of the listed impairments. Neither the Social Security law nor logic commands an ALJ to discuss all or any of the listed impairments without some significant indication in the record that the claimant suffers from that impairment.

Even though the undersigned questions Plaintiff's disability relative to his back impairment, there is "significant indication in the record" that Plaintiff suffers from an impairment. The record contains the following: Dr. Manchin's opinion that Plaintiff suffered from "lumbosacral spine with left lower extremity radiculopathy (although the ALJ did not assign controlling weight to the treating physician's opinion) (R. 318); a CT scan which showed "[c]entral and left-sided protrusion/herniation of L5-S1; equivocal for minimal posterior displacement of left S1 root in the lateral recess" (R. 201); Dr. Weinstein's opinion that Plaintiff suffered "sacroiliac strain and sprain and/or lumbar strain and sprain" (R. 204); and Dr. Koay's diagnosis of Plaintiff's "lower back pain in the lumbar area with left radiculopathy cause deferred." (R. 306).

Additionally, the ALJ entered into a dialogue with Plaintiff's counsel at the April 2, 2003, administrative hearing, wherein the attorney stated Plaintiff's "condition" met the criteria for Listing 1.04. Specifically, the attorney asserted Plaintiff had "an L5-S1 lesion. . . . S1 nerve root impingement on the left. . . . reflex loss, positive straight leg raising, decreased range of motion, decreased strength . . . ." The ALJ stated she would "look at that" (R. 84-85). The ALJ clearly knew, based on her knowledge of the evidence of record and her exchange with Plaintiff's counsel

19

at the administrative hearing, that Plaintiff's impairment could possibly meet Listing 1.04, but she failed to make that determination through the required comparison.

The undersigned, therefore, finds the ALJ erred in not identifying the relevant listed impairments and comparing each of the listed criteria to the evidence of Plaintiff's symptoms.

### D. Treating Physician' Medical Opinions

The Plaintiff contends that the ALJ failed to properly evaluate the medical opinions of the Plaintiff's treating physician as required under SSR 96-2p. The Defendant contends that Dr. Manchin's opinion was appropriately weighed.

SSR 96-2p states, in part, the following:

Controlling weight. This is the term used in 20CFR 404.1527(d)(2) and 416.927(d)(2) to describe the weight we give to a medical opinion from a treating source that must be adopted. The rule on controlling weight applies when all of the following are present:

- The opinion must come from a "treating source," as defined in 20CFR 404.1502 and 416.902. Although opinions from other acceptable medical sources may be entitled to great weight, and may even be entitled to more weight than a treating source's opinion in appropriate circumstances, opinions from sources other than treating sources can never be entitled to "controlling weight."

- The opinion must be a "medical opinion." Under 20CFR 404.1527(a) and 416.927(a), "medical opinions" are opinions about the nature and severity of an individual's impairment(s) and are the only opinions that may be entitled to controlling weight. (See **SSR 96-5P**, "Titles II and XVI: Medical Source Opinions on Issues Reserved to the Commissioner.")

- The adjudicator must find that the treating source's medical opinion is "well-supported" by "medically acceptable" clinical and laboratory diagnostic techniques. The adjudicator cannot decide a case in reliance on a medical opinion without some reasonable support for the opinion.

- Even if well-supported by medically acceptable clinical and laboratory diagnostic techniques, the treating source's medical opinion also must be "not inconsistent" with the other "substantial evidence" in the individual's case record.

If any of the above factors is not satisfied, a treating source's opinion cannot be entitled to controlling weight.

In determining the weight to be afforded to the treating physician, the ALJ noted, in her decision, Dr. Manchin's role as Plainitff's "treating source" physician and his "medical opinions" about the nature and severity of Plaintiff's back condition (R. 18-20). The ALJ recounted Dr. Manchin's treatment of Plaintiff at the Manchin Clinic during 2001 and 2002, which included "treatment records [that] noted the claimant's decreased range of motion with side bending, rotation, flexion, and extension" (R. 18). The ALJ further recognized Dr. Manchin's medical opinion, which was contained in a February 11, 2003, letter, submitted for the record, that Plaintiff's "diagnosis was lumbosacral disc disease, with left lower extremity radiculopathy. The claimant had difficulty with bending, twisting, lifting, and occasionally when walking. The claimant had markedly decreased range of motion with side bending, rotation, flexion, and extension of the lumbosacral spine." Dr. Manchin further opined in that correspondence that Plaintiff "was not capable of performing any type of work on a sustained full-time basis" (R. 19).

In continuing her assessment as to controlling weight as to the treating physician, the ALJ considered "clinical and laboratory diagnostic techniques," specifically the CT scan which was conducted of Plaintiff's spine on September 24, 2001, at the Manchin Clinic. It revealed a "central and left-sided protrusion/herniation of L5-S1 that was equivocal, with minimal posterior displacement of the left S1 root in the lateral recess (Exhibit 3F, page 26)" (R. 18). The ALJ also considered Dr. Manchin's statement in the February 11, 2003, letter that the September, 2001, CT

21

scan "revealed disc herniation at L5-S1 consistent with the symptoms the claimant was experiencing" . . . and he "believed that the MRI that was read as normal was not credible" (R. 19).

Finally, in conducting the controlling weight analysis, the ALJ examined the treating source's medical opinion as to its being "'not inconsistent' with the other 'substantial evidence' in the individual's case record." There is substantial evidence in the evidence of record which is inconsistent with opinion of Dr. Manchin. As noted by the ALJ, Dr. Bailes, a neurosurgeon, examined Plaintiff on October 29, 2001, and found "neurological and sensory examinations were normal." There was some tenderness noted "at the L4-5 region." After Dr. Bailes' review of the September, 2001, CT scan and physical examination of Plaintiff, he ordered an MRI of Plaintiff's lumbar spine, which was conducted on November 26, 2001. The MRI was normal and a subsequent physical examination of Plaintiff by Dr. Bailes on November 29, 2001 "was within normal limits (Exhibit 2F, page 2)" (R. 18). On January 17, 2002, Dr. Weinstein, a neurosurgeon, examined Plaintiff and concluded the "examination was not overly positive." He could "elicit pain by stressing the sacroiliac joint, and suggested that the claimant had sacroiliac sprain/strain." Dr. Weinstein had no "surgical recommendations," but did "recommend a program of back exercises and walking as well as a trial left sacroiliac joint injection." Then, on February 13, 2003, Dr. Weinstein reiterated his opinion that Plaintiff did not have "any operative condition"; should continue to walk; should do isometric exercises; and "could find some other work not involving heavy lifting" (R. 18,19).

Additional substantial evidence of the record noted by the ALJ, which was inconsistent with the opinion of Dr. Manchin, included the following: 1) the results of a July 11, 2002, functional capacity evaluation of Plaintiff at Health Works in which it was determined that Plaintiff

"demonstrated a capacity for performing sedentary-light physical demands" (R. 18); and 2) the "opinions of state agency medical . . . consultants," . . . who "have indicated that the claimant has the necessary . . . physical residual functional capacity to perform work (Exhibits 7F and 9F)" (R. 20).

The ALJ also considered the February 11, 2003, independent medical examination by Dr. Koay for workers' compensation purposes, evidence which was inconsistent with Dr. Manchin's opinion. Dr. Koay found "lower back pain at the lumbar area, with left radiculopathy," but that "the condition of the lower back at the lumbar area has not reached M.M.I." (R. 18-19, 306). He "recommended further testing . . . and . . . concluded that the claimant was temporarily totally disabled from performing his prior job (Exhibit 13F, page 7)" (R. 18-19).

In her decision, the ALJ assessed Dr. Manchin's opinion about Plaintiff's condition and limitations as follows:

> The opinion of a treating physician is entitled to appropriate consideration pursuant to SSR-962p. Dr. Manchin has opined that the claimant is unable to sustain any gainful employment. However, this opinion is not entitled to controlling weight or special significance because it is on an issue reserved to the Commissioner (20 CFR 404.1527(3) and SSR 96-5p). I do not find the opinions of Dr. Manchin to be persuasive. Dr. Manchin has argued that the normal lumbar MRI findings should be ignored. To do so would be to ignore the normal examinations conducted by two neurosurgeons, who indicated that there were no operative spinal impairments (R. 20).

There was persuasive contradictory evidence to rebut Dr. Manchin's opinion that Plaintiff was not capable of performing full-time work of any type on a sustained basis because of his back condition (R. 19, 318-19). That persuasive contradictory evidence was in the forms of 1) Dr. Bailes' November 29, 2001, examination of Plaintiff which "was within normal limits"; 2) the November 26, 2001, MRI, which was normal; 3) the January 17, 2002, diagnosis by Dr. Weinstein

23

of "sacroiliac sprain/strain" and his treatment program of back exercises, walking, and a trial left sacroiliac joint injection (R. 18); 4) the February 13, 2003, opinion of Dr. Weinstein that Plaintiff did not have "any operative condition," should continue to walk and do isometric exercises, and "could find some other work not involving heavy lifting"(R. 19); 5) the results of a July 11, 2002, functional capacity evaluation of Plaintiff at Health Works in which it was determined that Plaintiff "demonstrated a capacity for performing sedentary-light physical demands" (R. 18); and 6) the "opinions of state agency medical . . . consultants," . . . who "have indicated that the claimant has the necessary . . . physical residual functional capacity to perform work" (R. 20). Since Dr. Manchin's medical opinion is inconsistent with other substantial evidence of the record, his opinion is not entitled to controlling weight. *See* SSR 96-2p.

According to 20 CFR § 404.1527(d), when the treating source's opinion is not entitled to controlling weight, it must be weighed according to the following factors: 1) examining relationship, 2) treatment relationship, including length of treatment relationship and frequency of examinations and nature and extent of treatment relationship, 3) supportability, 4) consistency, and 5) specialization. The ALJ considered each of those factors as follows: 1) the examining relationship of not only Dr. Manchin, but the opinions of Drs. Bailes, Weinstein, and Koay, other doctors who examined Plaintiff and who did not find him disabled (R. 18-20); 2) Dr. Manchin's having served as Plaintiff's treating physician in 2001 and 2002 and having referred him to physical therapy (R. 18); 3) Dr. Manchin's having supported his medical opinion with the CT scan, conducted at the Manchin Clinic, which showed disc herniation at L5-S1, and not the "MRI that was read as normal" (R. 19); 4) the inconsistencies between the opinion of Dr. Manchin and the two neurologists and independent medical doctor (as noted above) (R. 18-20); and the opinions relative to Plaintiff's condition and level of disability of two examining neurologists (R. 18-20)

The undersigned, therefore, concludes the ALJ did not err in her evaluation of Dr. Manchin's medical opinion; the ALJ properly applied SSR 96-2p in determining whether the treating physician's medical opinion was entitled to controlling weight; and the ALJ complied with 20 CFR § 404.1527(d) in weighing the medical opinions.

## V. RECOMMENDED DECISION

For the reasons herein stated, the undersigned finds the ALJ's evaluation of the medical opinions of the Plaintiff's treating physician as required under SSR 96-2p was proper; however, the undersigned finds the ALJ erred in failing to fully discuss the requirements of Listing 1.04 and to compare those requirements to the evidence of record as to Plaintiff's symptoms as mandated in *Cook v. Heckler*. I, accordingly, recommend Defendant's Motion for Summary Judgment be **DENIED,** and the Plaintiff's Motion for Summary Judgment be **GRANTED** and this action be **REMANDED** to the Commissioner for further action in accordance with this Recommendation for Disposition.

Any party may, within ten (10) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should also be submitted to the Honorable Irene M. Keeley, United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *Thomas v. Arn*, 474 U.S. 140 (1985).

The Clerk of the Court is directed to mail a copy of this Report and Recommendation to counsel of record.

Respectfully submitted this _19_ day of ~~April~~ MAY, 2005.

JOHN S. KAULL
UNITED STATES MAGISTRATE JUDGE